Filed 1/16/26  P. v. Gray CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID EARLVON GRAY,<br><br>    Defendant and Appellant. | F087946<br><br>(Super. Ct. No. BF188511B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen, and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Justin Griffin, Jr. (Junior) was fatally shot after leaving a house party with his father, Justin Griffin, Sr. (Senior).[1] As they departed in Senior's car, a vehicle driven by Demitris Devon King and occupied by David Earlvon Gray (appellant) and Christian Francois Gaines followed them. Junior was an active gang member, and appellant, King, and Gaines were members of rival gangs. Several minutes later, King's car pulled alongside Senior's vehicle, and multiple shots were fired from its front passenger-side window, striking Senior's car repeatedly. Senior was uninjured, but Junior was shot once in the side of the head, killing him.

A jury convicted appellant of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a))[2] and found true the special circumstances allegation that the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)). The trial court sentenced appellant to life in prison without the possibility of parole.

On appeal, appellant asserts that the trial court abused its discretion in admitting evidence regarding his participation in a prior shooting, that a rap video introduced at trial should have been excluded under Evidence Code section 352.2, and that trial counsel rendered ineffective assistance by failing to timely object to incriminating statements made by Gaines in a jail call. We conclude the challenged evidence was properly admitted and that appellant was not prejudiced by trial counsel's purported error. We affirm.

---

[1]    For clarity, we refer to Justin Griffin, Jr. as "Junior," and Justin Griffin, Sr. as "Senior." No disrespect is intended.

[2]    All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL BACKGROUND

## I.     Introduction.

The Bloods, Eastside Crips, and Westside Crips, are criminal street gangs in the city of Bakersfield.  The Warlord Piru Bloods are a subset of the Bloods gang.  The Bloods and the Eastside Crips formed a de facto alliance in 2020, and their members generally associate without conflict.  The Bloods and the Eastside Crips are rivals of the Westside Crips.

Appellant and Gaines were active Warlord Piru Bloods gang members.  King was an active Eastside Crips gang member.  Appellant and King are half brothers.  Junior was an active member of the Westside Crips.  Senior was a former member or associate of the Eastside Crips but no longer active.[3]

In November 2019, Jayden Laughlin, an active Warlord Piru Blood gang member, shot, but did not kill the 16-year-old son of Senior and younger brother of Junior.  Shortly after the shooting, an officer observed Laughlin leaving a nearby residence in a vehicle.  At the residence, officers contacted appellant and several other Warlord Piru Bloods gang members, including Vannoy Sutton.  The vehicle was driven by A.M., a close friend of appellant and Laughlin.  For the shooting, Laughlin was convicted in 2023 of premeditated attempted murder (§§ 664, subd. (a), 187, subd. (a)) and assault with a semiautomatic firearm (§ 245, subd. (b)).[4]

In the weeks leading up to the instant murder, a photo was circulating on social media showing Junior standing beneath the street signs at the intersection of 10th Street and "M" Street.  In the photo, Junior flashes the Warlord Piru Bloods hand sign with one hand and extends his middle finger toward the sign with the other.  The People's gang

---

[3]     The People's gang expert explained that it is not uncommon for family members to belong to different gangs.

[4]     This court affirmed Laughlin's convictions on appeal.  (*People v. Laughlin* (Jan. 2, 2025, F086433 [nonpub. opn.].)

expert explained this was an act of the "utmost disrespect" because the intersection of 10th Street and "M" Street is a Warlord Piru Bloods stronghold.

## II. The Murder of Junior.

On the evening of November 3, 2021, A.M. hosted a birthday party for herself at a rented house with the help of her mother, L.W. The house was located at the end of a cul-de-sac in a residential neighborhood. Approximately 30 to 40 people attended the party, including appellant, King, Gaines, Laughlin, and several other Warlord Piru Bloods and Eastside Crips gang members. A.M.'s best friend, R.W., was also present.

L.W. was in a dating relationship with Senior, and she invited him to the party. He drove there in his black Impala. He arrived around 6:00 p.m. with food for the party. After socializing and drinking for a few hours, he decided to leave, and L.W. walked him out to his car.

Senior claimed he did not recognize any gang members at the party or see anyone he believed was responsible for shooting his 16-year-old son. However, L.W. testified that as they walked to his car, Senior told her that "[t]he dude who shot my son is at the party." Surveillance video from a nearby residence showed appellant, Laughlin, and C.G. (a Bloods gang member) arrive at the party together in the car about an hour before Senior.

Senior testified that after he left the party he went to a friend's house and smoked marijuana, then drove home. There, he sent a text message to Junior, and Junior drove to his house. He told Junior they were going to the party because some of his friends from high school were there, and so Junior could meet some girls.

While Senior was gone, Gaines arrived at the party in his Malibu and parked in front of the party house. The Malibu was registered to the mother of King's children, but she described it as "his car." Surveillance footage showed that before Senior returned, the Malibu was moved up the cul-de-sac and out of view of the camera.

Senior and Junior drove back to the party in Senior's Impala and parked down the street. They entered through the front door and walked through the house into the backyard. Junior wore a mask that covered his nose and mouth. Junior was "acting observant" and looking around, and Senior was "mean-mugging" people. Party attendees began to scatter and move to other parts of the house, and there was an uncomfortable tension in the air. There were no arguments or altercations, but a few people told Junior he should not be there. A.M. and R.W. testified Junior's arrival was problematic because he is a Westside Crip gang member and several rival gang members were already present.

Minutes after they arrived, L.W. told Senior that he and Junior had to leave, then walked them out to Senior's Impala. Senior got into the driver's seat, and Junior got into the front passenger's seat.

Surveillance video from an adjacent residence showed that moments before Junior and Senior exited the party, appellant and Gaines were standing in the front yard. Appellant can be heard stating: "On 10th Street dissing the hood that's bullshit." Approximately 20 seconds later, Junior and Senior leave the party through the front door. King walks out behind Junior and Senior and joins appellant and Gaines. As Junior and Senior head toward Senior's Impala, appellant, King, and Gaines walk up the cul-de-sac in the direction of King's Malibu.

Senior testified that after leaving the party with Junior, he had no destination in mind and planned to "ride around." They initially drove eastbound on Planz Road. Surveillance footage from a residence on that street showed the Impala drive by, followed by the Malibu approximately 12 seconds later. Senior drove for several more city blocks, turning south, then west, and finally north onto New Stine Road. He did not notice anyone following them.

Senior stated that after he turned onto New Stine Road, he saw a car (the Malibu) driving behind them.[5] The Malibu pulled along his driver's side, and the front passenger's side window came halfway down. Senior saw muzzle flashes, ducked down, and heard multiple gunshots. He was unable to identify his attackers and claimed he could not see into their vehicle.

The Impala was struck at least eight times on the driver's side. The location and trajectory of the strikes were consistent with the shooter or shooters firing from the rear driver's side and moving forward. Junior suffered a single gunshot wound to his left temple, killing him instantly. Senior was not hit.

The sound of the shooting was captured by nearby a surveillance camera. The audio recorded 10 to 12 gunshots fired in rapid succession. Based on the cadence of the shots, Detective F. McIntyre, the lead investigator for the murder, opined that the shots were fired by more than one firearm. The shots occurred about three minutes after Junior and Senior drove away from the party.

After the shooting, the Malibu continued northbound on New Stine Road, then turned east onto Planz Road. Senior testified he reached over to check on Junior and saw he was unresponsive. He armed himself with Junior's .40-caliber handgun, which was tucked between the front passenger's seat and the center console, then followed the Malibu.[6] About one minute later, Senior caught up to the Malibu on Planz Road and fired seven shots from inside of his car, striking the Malibu in the trunk and the right front fender. Senior then continued eastbound on Planz Road, and the Malibu turned north, back in the direction of the party house.

---

[5] Senior gave only vague descriptions of the vehicle, identifying it as a blue or silver sedan. Because other evidence conclusively established that the car was King's Malibu, we refer to it as such for clarity.

[6] Senior claimed he did not realize Junior had a gun and did not see it until he reached over to check on him.

The sound of the second shooting was also recorded by a surveillance camera. The audio captured seven gunshots fired in rapid succession, with an even cadence that Detective McIntyre opined was consistent with only a single firearm being discharged. The second shooting occurred approximately 90 seconds after the first shooting.

Senior initially told investigating officers that Junior began returning fire at the Malibu while its occupants were still shooting at them on New Stine Road, and that he (Senior) never fired any shots. Senior later admitted to investigators that Junior never shot, but that he himself returned fire using Junior's gun after turning onto Planz Road. At trial, Senior testified that he lied because he feared he would face legal consequences if he admitted he had fired the shots. Senior testified with a grant of use immunity.

Senior testified that after the second shooting, he was distraught over the death of his son, so he drove aimlessly then pulled over somewhere and cried. After about 30 minutes, he drove to a nearby gas station and used the clerk's phone to call 911. Responding officers contacted Senior and observed Junior's body in the front passenger's seat of the Impala. There was a .40-caliber pistol at Junior's feet on the floorboard.

Surveillance footage showed the Malibu return to the party house about five minutes after the second shooting.[7] The car stops in the street in front of the house, appellant exits from the front passenger's side, and Gaines exits from the rear driver's side. As they exit, a male voice can be heard stating: "I was busting at the car I was shooting." Appellant and Gaines run to the front of the party house as the Malibu makes a U-Turn and drives away. Several people exit the house, including L.W., A.M., and R.W. Appellant and Gaines then get into Gaines's car and leave. In a law enforcement

---

[7]   The same camera showed Laughlin was in front of the party house approximately four minutes before the Malibu returned, consistent with the People's theory that Laughlin was not a passenger in the Malibu during the shooting.

interview, R.W. stated appellant appeared to be in a hurry and told them they "needed to get out of there."[8]

**Additional Evidence.**

King's Malibu was equipped with OnStar GPS tracking. OnStar records showed that the Malibu left the party at the same time as Junior and Senior and followed the same route they took from the party house to the location of the second shooting. The Malibu subsequently returned to the party house, consistent with surveillance footage, and then proceeded to King's residence, where it remained for the rest of the night. Additionally, cell phone location data for appellant, King, and Gaines demonstrated that, at the relevant times, their phones were in the general area of the party house and the shooting scenes. The records further showed that after returning to the party house, appellant and Gaines travelled to Gaines's residence.

Law enforcement officers found three expended nine-millimeter cartridge casings in the roadway along New Stine Road. The People's firearms expert opined that two of the casings were fired by the same firearm, and the third was fired by a different firearm.[9] In addition, seven expended .40-caliber cartridge casings were found in the roadway on Planz Road. The expert opined that the casings were all fired by Junior's .40-caliber handgun.

On November 2, 2021, the day before the murder, appellant sent R.W. messages on social media asking for "a ride to my gun." She picked him up, and he directed her to a motel, where he went inside alone and later returned to her car. She claimed she did not see a gun on his person.

On the night of the murder, about 40 minutes before Junior and Senior arrived, appellant used R.W.'s cell phone to record a video of himself at the party holding a gun.

---

[8]     At trial, R.W. testified she did not recall making this statement.

[9]     There was no evidence at trial that either nine-millimeter firearm was ever located.

About an hour after the murder, appellant sent King a message on social media asking, "[Y]ou good?"  King responded, "Hell, yeah.  I think I hit something small cuz my shit running funny, lol," followed by another message, stating, "It's a [s]mall hole in my shit."

The day after the murder, Gaines engaged in a text message conversation with a person identified as A.H.  After A.H. stated she was on the phone with "Van," Gaines responded, "[T]ell him to check the score."[10]  The People's gang expert explained that "check the score" is a sports reference indicating that the gang has "scored a point" by killing a rival gang member.

## III.   Rap Videos.

### A.   *"Top Opp."*

A rap video titled "Top Opp" was posted to YouTube on November 23, 2021.  Screen shots of the video and portions of the lyrics were admitted into evidence.

The song is performed by Gaines.  Appellant appears behind Gaines at various points.  Gaines wears a red baseball cap with the letters "ru," a reference to the Warlord Piru Bloods gang.  In portions of the video, Gaines stands in front of the street signs at the intersection of 11th Street and "M" Streets, one block from where the photo of Junior showing disrespect to the Warlord Piru Bloods was taken.  He also holds up his middle finger next to a hand sign for a subset of the Westside Crips gang.

In the lyrics of the rap song, Gaines states, "[T]rying to knock you and your main man.  Ain't fucking with no ghost Glocks.  Last skit that bitch jam."  Detective McIntyre explained that a "ghost Glock" is a self-built Glock style firearm, and a "skit" is a term used by gang members to refer to a shooting.  At another point in the song, Gaines states, "I love Lil Weez to the grave, I promise always foo."  "Weez" is appellant's moniker.

---

**10**   "Van" appears to be a reference to Vannoy Sutton, an influential Warlord Piru Bloods gang member who was incarcerated in county jail.

9.

Gaines's cell phone was seized and searched by law enforcement. The Notes application on the cell phone contained a number of apparent rap lyrics. Forensic analysis of the phone revealed that on November 4, 2021, the day after Junior's murder, references to "ghost Glock," "the last skit," and "I love Lil Weez," were added to the notes.

Six days after the murder, appellant used his cell phone to conduct 13 internet searches regarding whether a bullet fired from a "ghost gun" can be traced to the firearm that discharged it.

**B.      "*On the Head.*"**

A rap video titled "On the Head" was uploaded to YouTube on December 1, 2021. The song is performed by Laughlin. The video was played for the jury in its entirety.

Near the beginning of the rap song, Laughlin states: "You ain't pop a sucka bout cha brother." Detective McIntyre opined this appears to be a reference to Laughlin having shot Junior's younger brother.

Later in the song, Laughlin states: "I told lil Weez go do your shit, bitch he ain't stop at all … Broady almost put us up by two, but it wasn't yankin right[.] Four poles, four [n-word], bitch you might get spanked tonight." Detective McIntyre explained that "put us up by two" is a sports reference used by gang members for killing two people, and "wasn't yanking right" is slang for a gun not shooting properly or malfunctioning. He opined this language was significant because there were two people in the Impala when Junior was killed.

Two weeks before "On the Head" was posted to YouTube, appellant sent a message to Laughlin over social media stating, "On the Head." Laughlin responded, "[B]itch, why not that one?" Appellant replied, "[C]ause you're speaking facts and it adds up to other shit."

10.

## IV.    The Rufus Shooting and Sutton Jail Call.

On August 14, 2021, at approximately 4:00 a.m., officers responded to a ShotSpotter activation at a duplex on South Haley Street.[11]  There, officers discovered the body of Desmond Rufus, an Eastside Crip gang member, on the ground next to the front door of unit "B."  Rufus had sustained a gunshot wound to head and was deceased.

When officers arrived, there was a crowd of five to 10 people standing around Rufus' body, including two Eastside Crip gang members.  Inside unit "B," officers contacted appellant, Laughlin, and two other individuals.

Law enforcement personnel discovered fourteen 5.56-caliber cartridge casings in the street and on the sidewalk in front of the duplex.  Inside the fence line, officers found 8 nine-millimeter cartridge casings.  The nine-millimeter casings were located along a walking path that runs directly from the street to a parking area in the back of the duplex immediately behind unit B.  The front door of unit B opens onto this same walking path. In the parking area, officers discovered 7 nine-millimeter cartridge casings and five .40-caliber cartridge casings.  There were numerous bullet strikes on the front of the duplex. There were also bullet strikes on a fence behind the parking area, and at least one bullet strike on a car parked across in front of the duplex.

The People's firearms expert opined that six of the nine-millimeter cartridge casings recovered from the parking area were fired by the same firearm as one of the nine-millimeter cartridge casings recovered from the shooting scene on New Stine Road where Junior was killed.

About eight hours after the shooting, appellant spoke on the phone with Sutton, who was incarcerated in county jail.  A recording of the call was played for the jury.  At the beginning of the call, appellant states that he is "hella sour" and "sad."  He tells Sutton, "I wish I could talk to you how I want to."  Detective McIntyre opined appellant

---

[11]    Officers were informed that ShotSpotter detected volleys three separate volleys, consisting of 13 shots, 3 shots, and 15 shots, all occurring within 38 seconds.

was indicating he was speaking cryptically because the call was recorded. Appellant and Sutton then appear to discuss the Rufus shooting. Notably, appellant mentions that someone took a photo of Rufus's body by the "doorstep" before it was covered in sheets and posted it to social media.

At one point during the call, the following exchange occurs:

"Sutton: Yeah, [n-word], it's, it's, well, everything, it's brazy right now [n-word], they done killed my motherfucking love, [n-word]. Bruh, we was just, I was just with this [n-word] the day before I got locked up.

"[Appellant]: On God. That shit sour as fuck.

"Sutton: [N-word], did they [dougie]?

"[Appellant]: Uh-huh, good.

"Sutton: I heard-

"[Appellant]: Good. It's good.

"Sutton: Damn, blood.

"[Appellant]: On set."

Detective McIntyre and the People's gang expert explained that the Dougie is a dance, but it can also be a slang term for "do your thing" or doing what one is known to do. Based on the language and context of the call, and the evidence at the scene of the Rufus shooting, McIntyre opined that Sutton was asking appellant whether anyone else shot back. Appellant's response, "on set," is a slang term communicating that what was just said was truthful.

Later in the call, after appellant told Sutton about someone taking a photo of Rufus's body by the doorstep, the following exchange occurs:

"Sutton: Aint nobody else do they duggie?

"[Appellant]: I- I wish you was out. Bro, [n-word], I'm sour [n-word].

12.

"Sutton: Nobody blood?

"[Appellant]: Sour [n-word], I … [n-word's] sour.

"Sutton: [N-word]-

"[Appellant]: I'm telling you, it's burnt out."

## V. Appellant's Statement.

Appellant was arrested on November 23, 2021, and interviewed by law enforcement. A recording of the interview was admitted into evidence and played for appellant's jury.

Appellant stated he attended A.M.'s birthday party. He claimed King dropped him off, and that King did not attend the party. He remained at the party for two to three hours, then the mother of his children picked him up because he was intoxicated. He claimed that after he left, he heard "somebody" came to the party and that A.M.'s mother made everyone leave because "it was a big altercation" He acknowledged he was friends with Laughlin, but denied Laughlin was present at the party.

Appellant identified Junior in a photo and said they went to the same high school. He stated he did not have any problems with Junior and did not know of any conflicts between Junior and anyone else. He admitted he had seen the photo of Junior at the intersection of 10th Street and "M "Street giving the middle finger to the Warlord Piru Bloods gang sign but denied knowing whether anyone was upset by it. Appellant denied being in a gang, but stated most of his friends and family are Bloods. He claimed he had heard rumors that Junior was gang involved but did not know which gang.

After being confronted with surveillance video from the party, appellant admitted he arrived with Laughlin and Garrison, not King. When the interviewers showed appellant the video he took of himself at the party holding a gun, he admitted he had taken the video but claimed he did not bring a gun to the party and denied knowing

13.

whose gun it was. Later, he stated that Laughlin and Garrison both brought guns to the party, and that the gun shown in the video probably belonged to one of them.

Appellant eventually stated that while he was at the party, someone told him that Junior had arrived, but he never saw him. He acknowledged that Junior and Laughlin had been "beefing" because Laughlin shot Junior's younger brother. He stated he did not know why Junior decided to go to the party "unless he just wanted to get revenge back for his brother."

The interviewers showed appellant the surveillance video of him and Gaines in front of the party house in which appellant states, "On 10th Street dissing the hood that's bullshit." Appellant initially denied making the statement. Later in the interview, he admitted he made the statement, but claimed he actually said, "Wasn't he just disrespected on 10th Street?" He claimed that as he walked away from the house, he was told that he was drunk and needed to find a ride home, so he got into the car of a female who had been at the party and left. He stated he saw Junior get into a black or dark grey car but did not see him drive off.

## VI. Defense Evidence.

Gaines's godmother testified that she used to be in a dating relationship with Senior. She stated that every time she saw Senior, he had a gun. The last time she saw him with a gun was in early 2021. She stated Senior used to be affiliated with the Eastside Crips, and he told her that he carried a gun because "people still knew him," and he "never knew who would try to get him."

## PROCEDURAL BACKGROUND

The Kern County District Attorney's Office filed an information charging appellant, King, and Gaines with first degree murder (§§ 187, subd. (a), 189, subd. (a); count 1) and discharging a firearm at an occupied motor vehicle (§ 246; count 2). Appellant and Gaines were also charged with participation in a criminal street gang.

14.

(§ 186.22, subd. (a); count 3). As to count 1, the People alleged discharge of a firearm from a motor vehicle special circumstances (§ 190.2, subd. (a)(21)) and gang-murder special circumstances (§ 190.2, subd. (a)(22)).[12] As to counts 1 and 2, the People alleged gang enhancements (§ 186.22, subd. (b)(1)) and gang-related firearm enhancements (§ 12022.53, subds. (d), (e)(1)).

Appellant, King, and Gaines were tried jointly. To avoid prospective *Aranda/Bruton*[13] issues, the trial court empaneled two juries: one for appellant; the other for King and Gaines. The trial court also elected to bifurcate count 3, the gang-murder special-circumstance allegation, the gang enhancements, and the gang-related firearm enhancements. (See § 1109.)

The jury found appellant guilty of first degree murder (count 1) and discharging a firearm at an occupied motor vehicle (count 2). The jury also found true the special-circumstance allegation that the murder was committed by discharging a firearm from a motor vehicle.

After the verdicts were returned, the parties reached a negotiated plea agreement on the remaining charges and allegations, avoiding the need to proceed with the bifurcated phase of the trial. Specifically, appellant admitted the gang enhancements under section 186.22, subdivision (b)(1), as to counts 1 and 2, in exchange for the dismissal of count 3, the gang-murder special-circumstance allegation, and the gang-related firearm enhancements.

The trial court sentenced appellant as follows. On count 1, the court sentenced appellant to life in prison without the possibility of parole. On count 2, the court

---

**12**    Prior to trial, the trial court granted the People's motion to dismiss the gang murder special circumstances allegation as to King only.

**13**    *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

15.

sentenced appellant to 15 years to life, but stayed the sentence pursuant to section 654, subdivision (a). (See § 186.22, subd. (b)(4)(B).)

## DISCUSSION

**I.     Admission of the Rufus Shooting Evidence and the Jail Call Between Appellant and Sutton Was Not an Abuse of Discretion. Any Presumed Error Was Harmless.**

Appellant claims the trial court abused its discretion in admitting the Rufus shooting evidence and the recording of appellant's subsequent jail call with Sutton. He alleges such evidence was inadmissible under Evidence Code section 1101, subdivision (b), because it was offered to prove identity, but the Rufus shooting was "categorically dissimilar" to the charged offenses. He also contends the evidence should have been excluded under Evidence Code section 352 because it had limited probative value and was highly inflammatory.

### A.     *Background.*

During trial, appellant's counsel objected to the introduction of evidence that appellant was present at the scene of the Rufus shooting, citing Evidence Code sections 1101 and 352.[14] Counsel argued that the evidence had minimal probative value because the prosecution could not link appellant to any of the cartridge casings at the Rufus shooting scene, and that it was highly prejudicial because it connected him to a prior "shootout."

The prosecutor responded that the Rufus shooting and the subsequent jail call between appellant and Sutton directly linked appellant to Junior's murder. He contended the location of the cartridge casings and bullet strikes suggested that Rufus's attackers opened fire from the street, and that several people returned fire from the parking area

---

**14**     Appellant's counsel raised this objection after testimony regarding the physical evidence at the scene of the Rufus shooting, but before an officer testified that appellant was contacted there. We reject respondent's assertion that the objection was not timely and thereby forfeited the instant claim.

16.

immediately behind the duplex. Six of the nine-millimeter cartridge casings recovered from the parking area matched one of the cartridge casings found at the shooting scene on New Stine Road where Junior was killed. The prosecutor argued that because appellant was present at the Rufus shooting scene, and Rufus was an allied gang member, appellant was likely among the group that returned fire from the parking area. The prosecutor then noted that in the Sutton jail call, Sutton asked appellant if they "did their Dougie," which the prosecutor understood to mean "return fire," and that appellant responded in the affirmative.

The trial court overruled appellant's objection to evidence that appellant was present at the Rufus shooting, noting it had considered "Evidence Code Section[s] 352 and 1101 and everything else." The court also admitted the Sutton jail call as to appellant's jury only. The court initially indicated it would only allow the People to admit the portions of the call pertaining to the shooting and any references to the Bloods gang. However, after the court issued its ruling, appellant's counsel requested the entire call be admitted.

The trial court instructed the jury that if it determined appellant "possessed and discharged a 9mm firearm on August 14, 2021," it could only consider that evidence "for the limited purpose of deciding whether [appellant] possessed and discharged a 9mm firearm on November [3], 2021, or was a member or associate of a criminal street gang."[15] The court further instructed the jury it could not consider this evidence for any other purpose, including whether appellant "has a bad character or is disposed to commit a crime."

---

[15] The instruction was a modified version of CALCRIM No. 375 (Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.).

17.

**B.** *Applicable law and standard of review.*

Evidence Code section 1101, subdivision (a), " 'prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667.) Subdivision (b) of that section clarifies that evidence of uncharged misconduct may be admitted when it is " 'relevant to establish some fact other than the person's character or disposition.' " (*Fuiava,* at p. 667.) Such evidence "is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity." (*People v. Daniels* (1991) 52 Cal.3d 815, 856; see Evid. Code, § 1101, subd. (b).)

"When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant." (*People v. Daniels, supra,* 52 Cal.3d at p. 856.) This includes an assessment under Evidence Code section 352 of whether the probative value of the uncharged misconduct evidence "is substantially outweighed by the probability that its admission will … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352, see *People v. Lewis* (2001) 25 Cal.4th 610, 637.) "Because this type of evidence can be so damaging, " '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.' " (*Daniels,* at p. 856.)

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) "A ruling subject to this standard of review 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Pineda* (2022) 13 Cal.5th 186, 222.)

**C.** *An abuse of discretion did not occur. The evidence was admissible under Evidence Code section 1101, subdivision (b).*

Appellant contends the Rufus shooting evidence and jail call were inadmissible under Evidence Code section 1101, subdivision (b), because the evidence was offered to prove "identity" but was factually dissimilar from the shooting of Junior and Senior. Relying on language from *People v. Ewoldt,* he argues that for evidence of an uncharged offense to be admitted to prove identity, it must have been "committed in a manner nearly identical to that of … the charged offense[]." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*).) Observing that the instant charged offenses involved shots fired from a car, while the Rufus shooting appeared to involve return fire from outside a residence, he asserts that the " 'pattern and characteristics' " of the shootings were not " 'so unusual and distinctive as to be like a signature.' " (*Id.* at p. 403.)

Appellant's reliance on *Ewoldt* is misplaced. Prior misconduct evidence is relevant if it tends to prove "either an ultimate fact or an intermediate fact from which such ultimate fact may be inferred." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 239.) *Ewoldt* addressed the use of prior misconduct to directly prove identity when both the prior act and the charged offense were carried out in the same unusual or distinctive manner, allowing an inference that the same person committed both. (*Ewoldt, supra,* 7 Cal.4th at p. 403.) To support this inference, the uncharged misconduct "must be highly similar to the charged offenses, so similar as to serve as a signature or fingerprint." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056; see *Ewoldt,* at p. 403.)

Here, the Rufus shooting evidence and jail call were not admitted to directly prove identity through similarity. Instead, the evidence was offered to show that appellant previously possessed, or had access to, one of the firearms used in Junior's murder. This "intermediate fact" supported the ultimate inference of identity – that appellant was one of Junior's shooters. Therefore, it is immaterial that the Rufus shooting was factually dissimilar to the charged offenses. The evidence was admissible under Evidence Code

19.

section 1101, subdivision (b), because it was otherwise relevant to prove a fact at issue by reasonable inference. (*People v. Daniels, supra,* 52 Cal.3d at p. 856.)

### D. *The admission of the evidence was not an abuse of discretion under Evidence Code Section 352.*

Next, appellant claims the Rufus shooting evidence and jail call should have been excluded under Evidence Code section 352. He argues the evidence had no probative value because there was no physical evidence that appellant or anyone in his "group" fired the gun that produced the matching nine-millimeter cartridge casings, and that appellant did not admit to shooting a gun during the jail call with Sutton. He also contends the evidence was highly prejudicial because it suggested appellant was involved in a "gang shootout."

We are not persuaded. The Rufus shooting evidence was substantially probative because it connected appellant to one of the nine-millimeter firearms used in Junior's murder. The matching nine-millimeter cartridge casings were found in the parking area immediately behind the duplex where Rufus was killed, along with casings from at least two other firearms. As the prosecutor explained, the location of these casings was consistent with a group of shooters returning fire at Rufus's attackers. Appellant and Rufus were in allied gangs, and appellant was present at the shooting scene with other allied gang members. From this evidence, the reasonable inference can be drawn that appellant or one of his confederates discharged the matching nine-millimeter firearm in the parking area. This, in turn, suggested that appellant either owned the matching firearm or had access to it.

Appellant's connection to the matching firearm was further supported by the Sutton jail call. Although appellant expressed that he could not talk how he "want[s] to" and appears to speak cryptically, it is readily apparent that he and Sutton discussed the Rufus shooting. From this context, and based on his training and extensive experience as a gang and homicide investigator, Detective McIntyre opined that Sutton's question—

20.

"did they [Dougie]"—was intended to ask whether anyone else had fired back.[16] Appellant's answers—"it's good," and "on set"—were clearly affirmative responses. Even if, as appellant contends, his response was ambiguous as to whether he personally returned fire or whether others did, the statement was still probative because it corroborated the physical evidence suggesting that Rufus was killed by attackers and that individuals affiliated with Rufus returned fire. Thus, contrary to appellant's argument that the call lacked probative value, the statement supported the prosecution's theory that appellant was involved in the Rufus shooting. Accordingly, the call bolstered the inference that appellant had access to the matching nine-millimeter firearm, further connecting him to one of the weapons used in Junior's murder.

Regarding the risk of undue prejudice, we acknowledge that the admission of prior misconduct carries an inherent risk of inflaming the jury or prompting jurors to consider the evidence for an improper propensity purpose. (*People v. Johnson* (2022) 12 Cal.5th 544, 610; *People v. Thompson* (1988) 45 Cal.3d 86, 109.) Here, however, while the Rufus shooting evidence suggested appellant and/or his confederates discharged firearms, nothing indicated they were the initial aggressors or that their conduct was undertaken in furtherance of any additional criminal activity. Rather, consistent with the People's theory, it appears the shooting occurred in response to Rufus's attackers, and arguably in reasonable self-defense or defense of another. Thus, the Rufus shooting evidence did not carry the heightened risk of undue prejudice associated with more egregious or inflammatory prior misconduct.

To the extent appellant argues the gang aspects of the Rufus shooting were prejudicial, other evidence at trial independently and conclusively established appellant was an active gang member. This evidence included appellant's association with other

---

[16] McIntyre testified he had been a sworn peace officer at the Bakersfield Police Department for 12 years. After he started in patrol, he worked in the gang unit for four years, then as a homicide detective for five years.

known gang members, photographs depicting appellant flashing gang signs and wearing gang-related clothing, and the testimony and expert opinion of the People's gang expert. Although the gang-related charges and allegations were bifurcated, the trial court ruled that gang evidence was admissible in this stage of the trial because it was relevant to the defendants' motive and intent. Appellant's association with other gang members during the Rufus shooting was therefore relevant to establishing his gang affiliation and was not uniquely inflammatory in light of the other gang evidence presented at trial.

Finally, any prejudicial effect from the Rufus shooting evidence was minimized by the trial court's limiting instructions. As noted above, the court instructed the jury that it could only consider this evidence for the limited purpose of deciding whether appellant possessed and discharged a nine-millimeter firearm on the date of Junior's murder or was a member or associate of a criminal street gang. Likewise, the court instructed the jury it could only consider evidence of gang activity for the limited purpose of deciding whether appellant "acted with the intent, purpose and knowledge that are required to prove" the charged crimes and enhancements, "had a motive to commit the crimes charged," or acted in self-defense or the heat of passion. Both instructions expressly cautioned the jury that it could not consider this evidence for any other purpose, including propensity and criminal disposition. Absent evidence to the contrary, we presume the jury followed these limiting instructions. (*People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

In sum, the Rufus shooting evidence and jail call were substantially probative, and the danger of undue prejudice was limited. We therefore conclude that the trial court's decision to admit the evidence was not " 'arbitrary, capricious and patently absurd.' " (*People v. Pineda*, *supra*, 13 Cal.5th at p. 222.) Accordingly, our review for an abuse of discretion reveals the trial court did not err, and we reject this claim.

22.

**E.** *Any presumed error was harmless.*

Even assuming the trial court erred in admitting the Rufus shooting evidence and jail call, any error was harmless.

A "state law error in admitting evidence is subject to the traditional *Watson*[17] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439; see *People v. Gonzales* (2011) 51 Cal.4th 894, 924.) Appellant claims the more stringent "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California* applies because the evidence was so inflammatory and prejudicial that its admission violated due process. (*Chapman v. California* (1967) 386 U.S. 18, 24.) But the admission of evidence only results in a due process violation when " 'there are no permissible inferences the jury may draw from the evidence,' " such that its admission rendered the trial fundamentally unfair. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229; see *People v. Hunt* (2011) 196 Cal.App.4th 811, 817.) Here, no due process violation occurred because, as explained above, the Rufus shooting evidence served as circumstantial proof that appellant had prior possession of, or access to, one of the firearms used in the charged shooting.

Applying the *Watson* standard, we conclude that appellant has not demonstrated prejudice. Independent of the Rufus shooting, the evidence of appellant's guilt was overwhelming. Multiple surveillance cameras, cell phone records, and the OnStar GPS data conclusively established that appellant, King, and Gaines followed Junior and Senior as they left the party and tracked them to the location where the fatal shooting occurred. Senior testified that the shooters pulled along his driver's side and opened fire, consistent with the numerous strike marks on the Impala and the cartridge casings found on New Stine Road. After the shooting, surveillance footage showed appellant and Gaines return

---

**17**    *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)

to the house party in King's Malibu, and as they exited the car, either appellant or Gaines stated, "I was busting at the car I was shooting." The day before the party, R.W. gave appellant a ride to pick up a gun, and less than an hour before the shooting, appellant recorded himself at the party holding a gun. Appellant also had a strong motive to commit the shooting, given Junior's rival gang membership, the ongoing conflict with Laughlin over the shooting of Junior's brother, and appellant's photograph taken in Warlord Piru Bloods territory in a manner perceived as disrespectful. Moments before Junior and Senior left the party, and minutes before the shooting occurred, appellant expressed his anger over the photograph, telling Gaines, "On 10th Street dissing the hood that's bullshit." Moreover, when interviewed by law enforcement, appellant repeatedly changed his story and was untruthful about key details, such as how he left the party, evincing consciousness of guilt.

Appellant asserts there was significant evidence to support a theory of self-defense. He claims that Senior's testimony was the sole evidence describing the circumstances of the shooting but argues Senior lacked credibility because he first informed police that Junior — rather than himself — returned fire at the attackers' car. However, Senior's testimony that the shooter's opened fire on New Stine Road, and that he, not Junior, returned fire with Junior's gun over a minute later, on Planz Road, was fully corroborated by the physical evidence. Thus, contrary to appellant's claim, the prosecution case did not solely rest on Senior's testimony. In any event, nothing in the record meaningfully supported appellant's self-defense claim. The evidence showed that appellant and his codefendants followed Junior and Senior from the party, pulled alongside their car, and fired at least eight shots. There was no evidence Junior or Senior engaged in any aggressive conduct that would have justified such a lethal use of force.

We are also persuaded the purported error was harmless because, as we explained above, the trial court gave a clear limiting instruction, and the Rufus shooting evidence was not substantially prejudicial in light of the other material presented to the jury. We

24.

therefore conclude it is not reasonably probable that the verdicts would have been more favorable to appellant absent the purported error. (See *Watson, supra,* 46 Cal.2d at p. 836.) Any presumed error was harmless.

## II. Admission of the "On the Head" Rap Video Was Not an Abuse of Discretion.

The trial court admitted two rap videos: "Top Opp," performed by Gaines, and "On the Head," performed by Laughlin. Appellant contends that the admission of "On the Head" constituted an abuse of discretion under Evidence Code section 352.2, asserting that the lyrics were not sufficiently similar to the charged offenses, and that any probative value was outweighed by undue prejudice.[18] (Evid. Code, § 352.2, subd. (a).)

### A. *Background.*

As pertinent here, in "On the Head," Laughlin raps the following lyrics:

"You ain't pop a sucka bout cha brother, you ain't gunnin for em.

"[¶] … [¶]

"I told lil Weez go do your shit, bitch he ain't stop at all[.] You ain't slide for me when I got served, boy you is not involved[.] Broady almost put us up by two, but it wasn't yankin right[.] Four poles, for [n-word], bitch you might get spanked tonight."

The People moved in limine to admit both "On the Head" and "Top Opp." The trial court reviewed the videos off the record, then held an Evidence Code section 402 hearing to address their admissibility. During the hearing, Detective McIntyre testified for the People and explained the relevance of the two videos, consistent with his testimony at trial. With respect to "On the Head," McIntyre testified that Laughlin referenced appellant by his moniker ("Lil Weez"), and that appellant sent Laughlin a social media message asking him not to post the video because Laughlin was "speaking facts and it adds up to other shit."

---

[18] Appellant does not challenge the admission of "Top Opp."

25.

Appellant's counsel objected to both videos under Evidence Code sections 352 and 352.2. Addressing "On the Head," he argued its lyrics did not bear sufficient similarity to the charged shooting. He further observed that significant portions of the lyrics concerned matters unrelated to the instant offenses, such as references to women and to types of firearms that were not involved in the charged shooting. The prosecutor disagreed, contending the lyrics contained direct references to appellant's involvement in Junior's murder.

The trial court overruled appellant's objection and admitted "On the Head," reasoning that it was posted close in time to the charged offenses and that the lyrics contained "specific information" connecting appellant to the shooting. The court also concluded appellant's social media messages to Laughlin asking him not to post the video constituted "some sort of acknowledgement by [appellant]."

**B.** *Applicable law and standard of review.*

"Evidence Code section 352.2, which became effective on January 1, 2023, calls for a particularized inquiry when the admissibility of a creative expression is challenged under Evidence Code section 352." (*People v. Aguirre* (2025) 18 Cal.5th 629, 687.) It specifies that in balancing the probative value of "evidence of a form of creative expression" against the danger of undue prejudice, the trial court must consider that: "(1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (Evid. Code, § 352.2, subd. (a).) The court must also

consider "any additional relevant evidence offered by either party."  (*Id.*, subd. (b).)  The statute broadly defines "creative expression" to include "the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media."[19]  (*Id.*, subd. (c).)

We generally review a trial court's decision to admit evidence for an abuse of discretion.  (*People v. Thomas* (2023) 14 Cal.5th 327, 370.)

## C.     *An abuse of discretion did not occur.*

Appellant's primary challenge to the admission of "On the Head" is that it lacked probative value because its lyrics did not exhibit "a sufficient level of similarity to the charged crime[s]."  (Evid. Code, § 352.2, subd. (a).)  We disagree.  Based on our review of the video, its lyrics, and the totality of the evidence, we conclude that the shooting described in "On the Head" closely mirrors the circumstances of Junior's murder.

At the start of the video, Laughlin raps, "You ain't pop a sucka bout cha brother," an apparent reference to Laughlin having shot Junior's brother in 2019.  This prior shooting was the primary source of the conflict between Junior and Laughlin and may have motivated Junior to attend the house party.

Later in the song, Laughlin references appellant by his moniker, stating: "I told lil Weez go do your shit, bitch he ain't stop at all." "Do your shit" is consistent with telling appellant to "do your thing," which the People's gang expert explained can mean to carry out a shooting.

Next, Laughlin raps, "Broady almost put us up by two, but it wasn't yankin right." According to Detective McIntyre, "almost put us up by two" is a sports metaphor commonly used by gang members to signify nearly killing two individuals.  This aligns

---

[19]     Respondent asserts that Evidence Code section 352.2 is inapplicable to *On the Head* because Laughlin was not charged in this case.  However, nothing in the language of the statute suggests it is only applicable to creative expression by charged defendants.

with appellant and his codefendants shooting at both Junior and Senior but only killing Junior.

Appellant claims the line "it wasn't yankin right" is inconsistent with the charged shooting because there was no physical evidence the shooters' guns jammed. However, in "Top Opp," Gaines raps, "Ain't fucking with no ghost Glock. Last skit that bitch jam." Like "On the Head," "Top Opp" was posted online close in time to the charged shooting. Gaines also references appellant by his moniker, and appellant appears in the video behind Gaines. Forensic analysis of Gaines's cell phone revealed that references to "ghost Glock," "the last skit," and "I love Lil Weez," were added to the Notes app the day after the murder. Furthermore, forensic analysis of appellant's cell phone showed that, six days after the murder, he conducted numerous internet searches on whether a discharged bullet can be traced to a "ghost gun." Viewed collectively, this evidence suggested that one of the firearms used in the attack on Junior malfunctioned, consistent with the shooting depicted in "On the Head."

We are similarly unpersuaded by the other alleged discrepancies identified by appellant. First, appellant argues the line, "Four poles, for [n-word], bitch you might get spanked tonight," does not correspond to the charged shooting because the People's theory was only three people participated. However, Detective McIntyre testified that a "pole" is a slang term for a gun, and the reference to "four" could indicate the presence of four armed individuals at the party—appellant, Gaines, Laughlin, and Garrison. Next, appellant asserts that the lyrics identify the shooter as "Broady," yet there was no evidence that any person by that name was involved in Junior's murder. However, in the context of the song, it is apparent that "Broady" is a term of endearment—similar to "bro" or "brother"—and is used to refer to appellant. Finally, appellant notes that when Laughlin raps, "I told lil Weez go do your shit," he mimics the act of shooting by holding an imaginary rifle with both hands, whereas the prosecution alleged that the shooting was committed with a nine-millimeter handgun. This gesture only confirms that "do your

shit" was intended to convey an instruction to commit a shooting. That Laughlin pantomimed a different type of firearm does not meaningfully detract from the substantial similarities between the lyrics and the charged offenses.

Other evidence further reinforces our conclusion that "On the Head" was substantially probative under Evidence Code section 352.2. Two weeks before the video was posted online on December 1, 2021, appellant sent Laughlin a message on social media asking him not to post it, stating that Laughlin was "speaking facts and it adds up to other shit." This request constitutes a clear acknowledgment that Laughlin's lyrics conveyed a "truthful narrative." (Evid. Code, § 352.2, subd. (a).) Furthermore, the timing of the message suggests that the lyrics were drafted weeks before the video was posted and were therefore created even "near[er] in time to the charged crime[s]." (*Ibid*.)

In addition to disputing the probative value of "On the Head," appellant contends that its admission gave rise to the type of undue prejudice described in Evidence Code section 352.2: "the possibility that the trier of fact will … treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (Evid. Code, § 352.2, subd. (a).) Appellant notes that the entire video was played for the jury, even though a substantial portion of the lyrics were irrelevant to the charged offenses. He points to Laughlin's repeated use of profane language and the "N-Word," as well as references to unrelated shootings, sexual conduct, gang activity, and other acts of violence. He argues the video depicts "a group of young black men throwing gang signs, mimicking the firing of guns, and giving the middle finger throughout the video."

We recognize that the admission of "On the Head" presented some danger of unfair prejudice due to the aspects of the video highlighted by appellant. However, in enacting Evidence Code section 352.2, the Legislature did not intend to exclude all creative expression from evidence that contains potentially prejudicial or inflammatory

material. Instead, it created a "framework" by which courts can ensure that the creative expression is sufficiently probative, and not "used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence." (Assem. Bill No. 2799 (2021–2022 Reg. Sess.) (Stats. 2022, ch. 973, § 2, subd. (b).) Here, the creative expression evidence was not, as the Legislature cautioned, merely "circumstantial evidence of motive or intent." (*Ibid.*) Rather, it constituted compelling, direct evidence that appellant committed the charged crimes. Given this clear probative value, the trial court was justified in finding the danger of unfair prejudice did not warrant exclusion.

We also observe that the prejudicial impact of "On the Head" was mitigated by several factors. The video was relatively brief, with a duration of three minutes and eight seconds. Throughout the trial, the prosecution referenced only those portions of the videos' lyrics that were relevant to the charged offenses. Moreover, as we explained above, the evidence at trial conclusively established appellant, Laughlin, King, Gaines, and other associates were members of allied criminal street gangs. The trial court also admitted "Top Opp," the admission of which appellant does not contest on appeal. "Top Opp" contained content similar in nature to that in "On the Head," including Gaines's use of profanity, a reference to an act of violence, and the display of gang signs. Thus, "On the Head" was not uniquely inflammatory given the other evidence at trial.

The record reveals the probative value of "On the Head" was substantial and not outweighed by the danger of undue prejudice, even under the heightened scrutiny required by Evidence Code section 352.2. We therefore conclude the admission of the video was not " 'arbitrary, capricious and patently absurd,' " and we reject this claim.[20] (*People v. Pineda, supra,* 13 Cal.5th at p. 222.)

---

[20] Because we conclude "On the Head" was properly admitted, we necessarily reject appellant's claim that its admission violated due process.

30.

**III. Appellant Was Not Prejudiced by Trial Counsel's Failure to Timely Object to the Admission of Gaines's Incriminating Statements.**

The day after Junior's murder, Sutton called Gaines from jail, during which Gaines made statements implying that he and appellant were responsible for Junior's death. A recording of the jail call was admitted before both juries without objection from defense counsel. After the recording was played, appellant's counsel stated he did not realize that specific jail call would be played for appellant's jury and requested a limiting instruction. The trial court ultimately granted the request and instructed appellant's jury not to consider the call as evidence against appellant. Appellant now contends trial counsel was ineffective for failing to timely object to the jail call, and that its admission resulted in prejudice despite the limiting instruction.

**A.** *Background.*

During trial, the People sought to admit the recording of a jail call from Sutton to Gaines that occurred on November 4, 2021– the day after Junior's murder. After laying foundation, the People moved to admit the call into evidence. When asked if he had any objection, appellant's counsel responded, "Submitted, Your Honor." Counsel for King and Gaines also had no objection. The call was played for the jury in its entirety.

In the call, Gaines states that "somebody just bit the dust last night." Sutton responds that "Chuck" told him, "Would've probably seen it coming, way his eyes was open," and that "Blood didn't have his glasses on." Gaines says he needs to talk to Sutton in person, and Sutton presses for details, stating: "Throw me something … a dog bone or something." Gaines then states, "[M]an, just only thing I can say is me and Lil' W, its [*sic*] time for that Dub-S-K" Sutton and Gaines then agree that "Weez" is "moving too fast" because "that's [A.M.'s] people."

Detective McIntyre opined that Sutton and Gaines were discussing Junior because he wore glasses, and his father was dating A.M.'s mother. He explained that "Dub-S-K" is short for "Westside Killer," and that gang members will often declare who they have

31.

killed by putting a "K" at the end of the name. He also reiterated that "Weez" is appellant's moniker.

Later that day, the trial court stated there had been a sidebar regarding the jail call and that appellant's counsel had indicated he was requesting a limiting instruction. Appellant's counsel explained that when the call was played, he did not realize it was "this specific call," and that he thought it was going to be admitted as to King and Gaines's jury only.[21] Counsel argued that the entire call should have been excluded, and the portion relating to appellant and "Dub-S-K" is inadmissible under *Aranda/Bruton*. He requested that, if the court chose not to exclude the call in full, it issue a limiting instruction directing appellant's jury not to consider Gaines's statements implicating appellant.

The trial court directed the prosecutor and appellant's counsel to meet and confer on a limiting instruction and to report back to the court. The prosecutor agreed to confer with appellant's counsel on a limiting instruction but argued there was no *Aranda/Bruton* issue because the call was nontestimonial.[22] The court agreed that no *Aranda/Bruton* issue existed but stated a limiting instruction may be appropriate. The court further stated that if the parties could not agree on a limiting instruction, it would draft its own.

The trial court instructed the jury that evidence admitted for a limited purpose can be considered only for that purpose (CALCRIM No. 303), and that evidence admitted solely against a particular defendant cannot be considered against any other defendant (CALCRIM No. 304). The court then gave a modified version of CALCRIM No. 305

---

[21] Counsel's confusion appears to have stemmed from earlier proceedings in which the parties litigated the admissibility of other jail calls from Sutton to Gaines, which were admitted only as to King and Gaines's jury.

[22] The prosecutor also noted that the jail call had been marked as an exhibit since the start of trial and had been discussed in limine in connection with Gaines's motion to exclude a different jail call. These observations were presumably meant to show that appellant's counsel had notice that the People intended to introduce the call.

(Limited Admissibility of Defendant's Statement), which provided, in relevant part: "You have heard evidence of a call between Mr. Sutton and Mr. Gaines. This evidence was admitted for the limited purpose of considering it as evidence against Mr. Gaines. [¶] … [¶] You may not consider his statements as evidence against Mr. King or [appellant]."

During deliberations, appellant's jury sent a note to the trial court that read: "You stated we can't use [the Gaines-Sutton jail call] against [appellant], however, can we use [Detective McIntyre's] testimony regarding the jail call[?]" The court sent the following response: "[P]lease review the jury instructions and specifically [CALCRIM Nos. 304 and 305]. Because you cannot consider the call between Mr. Sutton and Mr. Gaines as evidence against [appellant], you cannot consider opinions, comments on, or interpretation of that call by [McIntyre]."

### B. *Standard of review*.

To prevail on an ineffective assistance of counsel claim, the claimant must establish counsel's performance fell below an objective standard of reasonableness, and that prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) "Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Jennings* (1991) 53 Cal.3d 334, 357.) The defendant has the burden of showing both deficient performance and resulting prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

### C. *Trial counsel's failure to object did not prejudice appellant*.

Appellant claims his trial counsel was ineffective because the jail call was inadmissible hearsay without exception and would have been excluded if trial counsel had objected before it was admitted. Characterizing Gaines's statements in the call as an

admission that he and appellant "murdered" Junior, he argues admission of the call was so powerfully incriminating that it resulted in incurable prejudice.

We need not determine whether trial counsel's performance was deficient because appellant fails to establish sufficient prejudice. (See *Strickland v. Washington, supra,* 466 U.S. at p. 697.) As we previously explained, the evidence of appellant's guilt was overwhelming. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1052 [counsel's failure to object harmless in light of conclusive evidence of guilt].) Appellant asserts that Gaines's statements implicating him prejudiced his self-defense theory, yet, as discussed above, the evidence at trial rendered that theory insubstantial.

The trial court also gave a clear limiting instruction directing appellant's jury not to consider the jail call.[23] We presume the jury followed this instruction. (*People v. Waidla, supra,* 22 Cal.4th at p. 725; *People v. Mickey*, *supra*, 54 Cal.3d at p. 689, fn. 17.)

Appellant contends that this presumption does not apply because a codefendant's incriminating statement is so compelling that jurors cannot be expected to follow an instruction to disregard it. Although appellant does not explicitly argue that the admission of Gaines's statements in the jail call resulted in *Aranda/Bruton* error, he bases his position on both cases and related authority. (See *People v. Song* (2004) 124 Cal.App.4th 973, 982.)

"Broadly stated, the *Aranda/Bruton* rule declares that a defendant is deprived of his or her Sixth Amendment right to confront witnesses when a facially incriminating statement of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the statement only against the declarant." (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 68.) However, following *Crawford v. Washington* (2004) 541 U.S. 36, the *Aranda/Bruton* doctrine only applies to testimonial statements. (*People*

---

[23] Appellant's counsel highlighted the limiting instruction for the jury during closings arguments.

*v. Tran* (2022) 13 Cal.5th 1169, 1194; see *People v. Almeda* (2018) 19 Cal.App.5th 346, 362; *People v. Washington* (2017) 15 Cal.App.5th 19, 29; *People v. Arceo* (2011) 195 Cal.App.4th 556, 574–575.)  Gaines's statements in the jail call were clearly nontestimonial because they were "not made to law enforcement officers, nor were they otherwise made under circumstances suggesting a primary purpose of creating evidence for defendant's prosecution." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1217; see *People v. Ramirez* (2022) 13 Cal.5th 997, 1147 [accomplice's incriminating statements to witness over the phone were nontestimonial].)  Thus, this case does not fall within the *Aranda*/*Bruton* rule's " ' "narrow exception" ' " to the presumption that jurors follow limiting instructions.  (*People v. Hall* (2024) 104 Cal.App.5th 1077, 1098.)

Finally, appellant argues that the jury's question about whether it could consider Detective McIntyre's testimony concerning the Gaines-Sutton jail call demonstrates that the jury did not follow the limiting instruction.  The mere fact that the jury asked this question does not support such an inference, and nothing in the record suggests the limiting instruction was not followed.  Rather, the question shows that the jury conscientiously considered the trial court's instructions and sought guidance to ensure its deliberations remained within the scope of the limiting instruction.

Based on our review of the record, including the overwhelming evidence of guilt and the trial court's limiting instruction, we conclude there is no reasonable probability that but for counsel's failure to timely object to the Gaines-Sutton jail call, the result of the trial would have been different.  (See *People v. Jennings*, *supra*, 53 Cal.3d at p. 357.)  Therefore, appellant fails to demonstrate he was prejudiced by counsel's purported error, and this claim fails.

## IV.    Cumulative Error.

Appellant raises a claim of cumulative error.  He contends that, based on the totality of the errors identified above, he suffered a fundamentally unfair trial.  We disagree.

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)  A claim of cumulative error is essentially a due process claim.  (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.)  The test is whether the defendant received a fair trial.  (*Ibid*.)

We reject appellant's claim of cumulative error because we have denied all his individual claims.  (See *People v. Bradford*, *supra*, 14 Cal.4th at p. 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].)  Taking all of appellant's claims into account, we are satisfied that he received a fair adjudication.

## DISPOSITION

The judgment is affirmed.


LEVY, J.

WE CONCUR:


HILL, P. J.


HARRELL, J.

36.